481 F.2d 1274
 73-2 USTC P 9590
 The WHITE CASTLE LUMBER AND SHINGLE COMPANY, LTD., Plaintiff-Appellant,
v.
UNITED STATES of America, Defendant-Appellee.
BOWIE LUMBER COMPANY, LIMITED, Plaintiff-Appellant,
v.
UNITED STATES of America, Defendant-Appellee.
JEANERETTE LUMBER AND SHINGLE COMPANY, LTD., Plaintiff-Appellant,
v.
UNITED STATES of America, Defendant-Appellee.
 Nos. 73-1221 to 73-1223.
 United States Court of Appeals,
Fifth Circuit.
 Aug. 1, 1973.
Rehearing and Rehearing En Banc Denied Nov. 2, 1973.
 
 Malcolm L. Monroe, Benjamin R. Slater, Jr., Herman C. Hoffmann, Jr., Richard P. Wolfe, New Orleans, La., for plaintiffs-appellants.
 Scott P. Crampton, Asst. Atty. Gen., Meyer Rothwacks, Murray S. Horwitz, Attys., Tax Div., U.S. Dept. of Justice, Washington, D. C., Gerald J. Gallinghouse, U. S. Atty., Joan Elaine Chauvin, Asst. U. S. Atty., New Orleans, La., Charles G. Barnett, Tax Div., Dept. of Justice, Fort Worth, Tex., for defendant-appellee.
 Before GOLDBERG, CLARK and RONEY, Circuit Judges.
 PER CURIAM:
 
 
 1
 The judgments of the District Court, 355 F.Supp. 1127, are affirmed. Houston Farms Development Co. v. United States, 5 Cir. 1943, 131 F.2d 577, rehearing denied, 132 F.2d 861.
 
 
 2
 Affirmed.
 
 
 3
 GOLDBERG, Circuit Judge (specially concurring):
 
 
 4
 My brother, Clark, though disenchanted with Houston Farms, would affirm these three cases solely on the basis of its precedential command. Believing as I do in the tenets and teachings of Houston Farms, I feel compelled to explicate its holding and application to the cases at bar.
 
 
 5
 This is an appeal from a judgment of the District Court dismissing taxpayers' consolidated suits for recovery of income taxes assessed and collected from them. The sole question before this Court is whether certain payments that taxpayers received as landowners and lessors of oil and gas rights constituted depletable "lease bonuses" or nondepletable "delay rentals." Taxpayers seek to introduce yet another leprechaun into the mounting mythology of oil and gas taxation, but for the reasons stated herein, I feel that the District Court correctly found that the payments in question were nondepletable delay rentals.
 
 I.
 
 6
 Taxpayers, The White Castle Lumber and Shingle Company, Ltd., Bowie Lumber Company, Ltd., and Jeanerette Lumber and Shingle Company, Ltd., are Louisiana corporations that leased their lands to various oil companies under oil and gas leases. For the purposes of this appeal, all of the leases may be considered as basically the same, providing for (1) a cash down payment for the lease, (2) a primary term of between three and five years, (3) a selection date occurring six months or one year from the commencement of the lease, at which point the lessee was required to pay taxpayers a "selection bonus" to continue the lease for an additional year, and (4) a delay rental payment due (a) at the end of the year extension caused by the selection bonus if drilling or production had not been commenced during that year and (b) at the end of any subsequent years when drilling or production had not been commenced. The leases all contained provisions similar to the following paragraphs:
 
 
 7
 "This lease shall terminate as to both parties twelve (12) months from the date hereof (hereinafter referred to as "selection date"), unless on or before said date Lessee has, in writing, elected to retain this lease in whole or in part. If Lessee should so elect to select and retain all or any part of the acreage covered hereby, Lessee shall pay or tender to Lessor or to the credit of Lessor in the depository named herein, the sum of $35.00 per acre on the lands originally covered by this lease, even though Lessee has elected to select and retain less than 100% of such acreage. Said payments shall be a selection bonus and shall be a prerequisite under all circumstances to the continuance of this lease in effect after the selection date, and shall extend the terms of this lease for twelve (12) months following the selection date. If operations for the drilling of a well be not commenced on or before one year from the selection date, this lease shall terminate as to both parties unless Lessee on or before that date, shall pay or tender to Lessor, or to the credit of Lessor in the depository named herein, a rental in an amount based upon $35.00 per acre for the lands originally covered by this lease, even though this lease then covers less than 100% of the acreage originally covered hereby, which payment shall cover the privilege of deferring the commencement of operation for the drilling of a well on such lands for twelve (12) months from such date. Thereafter, and during the primary term of this lease, the commencement of such operation may be further deferred for successive periods of twelve (12) months each by payments or tender, on or before the first day of any such period for which such operation are deferred, of a rental in an amount based upon $35.00 per acre for the lands originally covered by this lease, even though this lease then covers less than 100% of the acreage originally covered hereby. The down cash payment and selection bonus are consideration for this lease according to its terms and shall not be allocated to a mere rental for a period.
 
 
 8
 ". . .
 
 
 9
 "The intent of the Lessor and Lessee is that during the primary term and in the absence of production, the Lessee may continue its rights under this lease in either one of two ways: (1st) at the expiration of any delay period, it may begin or be engaged in operations for the drilling of a well and continue same with due diligence; or (2nd) at the expiration of such delay period, it may pay the required delay rental."[1]
 
 
 10
 Unlike delay rentals, which could be avoided by drilling or production, the selection bonus payment had to be paid even if there had been drilling operations or production from the leased premises prior to the selection bonus date. The lessees could avoid paying the selection bonuses only by surrendering the leased premises prior to the dates on which the selection bonus payment became due.
 
 
 11
 On their returns for the tax years in question, taxpayers claimed depletion deductions on the selection bonuses they received under the lease. The Commissioner disallowed the deductions, treating the payments as nondepletable delay rentals, and assessed deficiencies, which taxpayers paid. After the Commissioner refused taxpayers' claims for refunds, taxpayer brought these refund suits in the District Court. The District Court sustained the Commissioner's position-ruling that the selection bonuses were nondepletable delay rentals, not lease bonuses that could be depleted-and this appeal followed.
 
 II.
 
 12
 The customary form of oil and gas lease in wide use in the oil and gas industry provides for an initial payment, or "bonus", upon the execution of the lease. "[A] true bonus is a payment which the lessee is obligated to make at all events, with or without production, which cannot be avoided by termination or abandonment of the leasing arrangement." 4 Mertens, Law of Federal Income Taxation (Rev.1966) Sec. 24.24 at p. 112 (emphasis added). See Lambert v. Jefferson Lake Sulphur Co., 5 Cir. 1956, 236 F.2d 542, 544-545. The bonus is depletable income to the lessor, for it is a "return pro tanto of [the lessor's] capital investment in the oil, in anticipation of its extraction . . . ." Palmer v. Bender, 1933, 287 U.S. 551, 559, 53 S.Ct. 225, 227, 77 L.Ed. 489, 494; accord Murphy Oil Co. v. Burnet, 1932, 287 U. S. 299, 302, 53 S.Ct. 161, 162, 77 L.Ed. 318, 322; Burnet v. Harmel, 1932, 287 U.S. 103, 111, 53 S.Ct. 74, 77, 77 L.Ed. 199, 205, and is regarded as "payment in advance for oil and gas to be extracted." Herring v. Commissioner, 1934, 293 U. S. 321, 324, 55 S.Ct. 179, 180, 79 L.Ed. 389, 391.
 
 
 13
 The normal oil and gas lease also provides for the optional payment of annual "delay rentals" during the primary term. Delay rentals are amounts paid for the privilege of deferring development of mineral properties. Delay rentals are nondepletable rents and:
 
 
 14
 "accrue by the mere lapse of time like any other rent. They do not depend on the finding or production of oil or gas and do not exhaust the substance of the land. While having some likeness to a bonus payment . . . the delay rental is not paid directly or indirectly for oil to be produced, but is for additional time in which to utilize the land."
 
 
 15
 Commissioner v. Wilson, 5 Cir. 1935, 76 F.2d 766, 769. See Treas.Reg. Sec. 1.612-3(c)(2).
 
 
 16
 The Treasury Regulations recognize that unlike a true bonus, which cannot be avoided by the lessee, 4 Mertens, Law of Federal Income Taxation, supra, the delay rental can be avoided in a number of ways. The Regulations provide:
 
 
 17
 "A delay rental is an amount paid for the privilege of deferring development of the property and which could have been avoided by abandonment of the lease, or by the commencement of development operations, or by obtaining production."
 
 
 18
 Treas.Reg. Sec. 1.612-3(c)(1).
 
 
 19
 It is clear from the foregoing discussion that because the selection bonus payments received by taxpayers could be avoided by abandonment of the lease, those payments (1) do not qualify as true bonuses and (2) are delay rentals as defined by the Treasury Regulations. Taxpayers contend, however, that the selection bonus payments should not be treated as delay rentals because (1) delay rentals are paid "solely for the privilege of deferring development of production" and therefore the critical distinction between a selection bonus and the normal delay rental is that the selection bonus cannot be evaded either by prior drilling operation or by production, and (2) the selection bonus is much more like an initial bonus than a delay rental because by the terms of the lease both payments are consideration for the lease and both payments extend the time for commencement of operations by the lessee.
 
 
 20
 Taxpayers' arguments are not persuasive. Whether a payment under a mineral lease is a delay rental or a true bonus is a question of fact that is best ascertained by analyzing the agreement of the parties, see Bayou Verret Land Co. v. Commissioner, 5 Cir. 1971, 450 F.2d 850, 856; Houston Farms Development Co. v. United States, 5 Cir. 1943, 131 F. 2d 577, 579, rehearing denied, 132 F.2d 861; Maureen Fitzimmons v. Commissioner, 1961, 37 T.C. 179, 184. For tax purposes, courts should not exalt form over substance, and the mere terminology of the lease is not determinative. Maureen Fitzimmons v. Commissioner, supra.[2] I do not think that the District Court was erroneous in determining that the selection bonus payments were actually delay rentals. I base this finding both upon the fact that the selection bonus payments in the agreement could be avoided by abandonment and upon the fact that these selection bonus payments served the same function as delay rentals.
 
 
 21
 In reaching this conclusion I am greatly influenced by the decision of this Circuit in Houston Farms Development Co. v. United States, 5 Cir. 1943, 131 F.2d 577, rehearing denied, 132 F.2d 861, and by the applicable Treasury Regulations.
 
 
 22
 In Houston Farms Development Co. v. United States, supra, the taxpayer-lessor received an initial bonus for executing an oil and gas lease for a primary term of five years and fifty-five days. The lease provided, however, that it would terminate in fifty-five days unless the lessee paid the lessor $12.50 per acre for all or such part of the leased land that it elected to retain. This retention payment, like the selection bonus under consideration, extended the lessee's rights in the retained land for a period of twelve months without requiring any operations or further payments. Furthermore, like the instant selection bonuses, the retention payment in Houston Farms evidently could not be avoided by drilling and could be avoided only by abandonment, for the lease automatically terminated if the payment was not made. Finally, just as in the leases now before us, the lease in Houston Farms provided in another clause for the payment of a delay rental[3] if the taxpayer had not commenced drilling before the end of the twelve-month extension period procured by the retention payment. This Circuit held in Houston Farms that the retention payment was not a bonus, but rather was a delay rental:
 
 
 23
 "We think it clear that the money was paid merely for holding the lease for a year without the necessity of drilling. It is in the nature of rental, involving no depletion of the oil reserve. This is made even clearer by the succeeding agreement to pay $5 per acre per year for succeeding years for the identical purpose, and this is expressly called rental. We see no difference at all in the purpose and effect of the payments. They are all in the nature of rentals, as respects depletion."
 
 
 24
 Houston Farms Development Co. v. United States, supra, 131 F.2d at 579. The Houston Farms decision is four square with the case sub judice and mandates this panel's affirmance of the District Court.
 
 
 25
 The Treasury Regulations, Treas.Reg. Sec. 1.612-3(c)(1), also support the determination that the selection bonus is a delay rental. The Regulations provide that a delay rental is a payment for deferring development of mineral lands that can be avoided: (1) by abandonment of the lease, or (2) by the commencement of development operations, or (3) by obtaining production. Thus, the Regulations support the result reached in Houston Farms and which this panel reaches here, for like the retention payments in Houston Farms, the selection bonus could be avoided by abandonment.[4]
 
 
 26
 Finally, the taxpayers' argument that the selection bonus is more like an initial bonus than a delay rental is not at all convincing. The selection bonus payments, like delay rentals, gave taxpayers the privilege of deferring development of the property for almost a full year from the selection date. In the event that no drilling was commenced prior to the selection date, the selection bonus served precisely the same function as a delay rental, for it (1) reimbursed the lessor for the loss he suffered in the absence of production; and (2) allowed the lessee to maintain the lease and further delay the time during which drilling would be required to be commenced. The fact that production actually occurred prior to the date of the selection bonus payment in a number of transactions under consideration is inconsequential, for in analyzing the leases the function which the selection bonus played in the overall agreement must be evaluated, cf. Bayou Verret Land Co. v. Commissioner, supra; Houston Farms Development Co. v. United States, supra, and a selection bonus that is payable six months or one year after the commencing of a lease and that extends the time for commencing drilling or production for only one year plays the same function in an agreement as would be played by a delay rental.[5]
 
 III.
 
 27
 History, economics, politics and compromise are the timbers supporting present construction of the Code and Regulations dealing with oil and gas taxation. At times it seems that words are the demons of subsurface taxation, for the artificial artifacts of mineral taxation can beguile the unwary. However, in reaching the proper result, one must be guided by economic and functional geodetics, rather than the semantic eccentricities of taxpayers' oil and gas leases. Viewing the leases from this economic and functional perspective, it is clear that only a misguided and misoriented lexicographer or philologist could be deceived into considering that the selection bonuses were payments for anything other than delay.
 
 
 28
 Generally speaking a bonus payment is a consensually bargained-for fixity for anticipated or hoped for production. To be depletable a bonus must be payable in all events with no conditions precedent or subsequent to subvert the payments. Conversely, a delay rental is an avoidable payment for deferring the development of mineral lands. Taxpayers would have this Court construe their lease instruments as divisible one year leases with a bonus payable before each year; however, the differences between the hybrids designated as selection bonuses in taxpayers' leases and a pristine delay rental are insubstantial. These leases envisioned a term of a number of years, and the payments denominated "selection bonuses" served no purpose not served by the delay rentals. The selection bonuses were for delay, and were not payments for minerals in place, or based upon any theoretical or actual extraction of taxpayers' oil and gas.
 
 
 29
 Bonus payments have justifiably or unjustifiably become a sanctified haven in our tax structure, but there is no reason to widen the haven's dimensions to include payments functionally indifferentiable from delay rentals. The District Court was correct in treating the selection bonuses as delay rentals.
 
 CLARK, Circuit Judge (specially concurring):
 
 30
 If I were free to do so I would follow Judge Hutcheson's dissent in Houston Farms on rehearing. 132 F.2d 861. The government's fiction of attaching taxable incidence to delay rentals can easily confuse related issues. Oil and gas leases are basically no different from other contractual agreements-each has its quid pro quo. The manner of expressing a payment should not control its economic substance. The "selection bonuses" in the cases at bar were much more akin to a tax depletable payment made to obtain an oil lease than to a nondepletable payment made to delay the production of oil. In fact, oil production and lease development were taking place on some of the leases in question at the time such selection bonuses were paid.
 
 
 31
 The touchstone of the government's position both in appellate argument and in its own regulation is that these selection bonuses were delay rentals because they could be avoided by abandonment. However, abandonment as a characteristic which would, in and of itself, determine taxation is a poor criterion. It is not indigenous solely to delay rentals; it may also appertain to tax depletable royalty payments-even a fixed-sum perbarrel royalty proviso-so long as the payment is to be made at a future date.
 
 
 32
 These selection bonuses were essentially payments for exercising an option to make a new "unless" lease to replace the initial time-limited tenancy, which, unless so replaced, unconditionally expired twelve months from its date. Allowing substance to control over form would bring me out in favor of reversing these cases.
 
 
 
 [1]
 The differences between the leases involve price, length of the primary term of the lease, and number of acres covered. One lease provided that the lessee must pay $25 per acre for 3,000 acres at the selection date, no matter how small the acreage selected, while all the other leases provided that the lessee must pay a speci fied amount per acre for the total original acreage covered by the lease, no matter how small the acreage selected
 In some of the leases the delay rental payment was less than the selection bonus payment. For example, in one lease the selection bonus was $25 and the delay rental was $15, and in two other leases the selection bonus was $50 and the delay rental was $25.
 
 
 [2]
 Thus, it is not dispositive that taxpayers' leases contained the following provision:
 "The down cash payment and selection bonus are consideration for this lease according to its terms and shall not be allocated to a mere rental for a period."
 
 
 [3]
 The delay rental payment in Houston Farms was less than one-half of the retention payment and therefore there is no significance in the fact that in some of the leases here under consideration the delay rental was one-half of the selection bonus. Moreover, the fact that the delay rental in Houston Farms was less than one-half of the retention payment supports the finding with regard to those leases under consideration where the selection bonus was equal to the delay rental
 
 
 [4]
 The emphasis placed on the fact that the selection bonuses were avoidable in determining that they are delay rentals is supported in prior Fifth Circuit decisions. In Lambert v. Jefferson Lake Sulphur Co., 5 Cir. 1956, 236 F.2d 542, the taxpayer entered into a sublease with the lessee of certain sulphur lands. The taxpayer agreed to conduct exploratory drilling operations and to pay the lessee, the taxpayer's lessor, a royalty if sulphur were discovered and produced. Under the prime lease, the lessee was obligated to pay the landowner a $300,000 bonus in quarterly installments of $7,500. In the sublease, the taxpayer agreed to pay his lessor, the lessee in the prime lease, an amount equal to the $7,500 quarterly installments. This agreement, however, was avoidable by the taxpayer if any of these events occurred: (1) a failure to exercise certain exploratory rights; (2) a failure to erect a sulphur production plant before a requisite date; or (3) a failure to conduct sulphur production before the requisite date. The Commissioner contended that the taxpayer's payments to his lessor under the sublease were bonus payments because under the lessor's prime lease they constituted bonus payments. This Court held, however, that the critical relationship was that between the taxpayer and his lessor, and that the avoidable payments made pursuant to the sublease "were in the nature of delay rentals . . .." Lambert v. Jefferson Lake Sulphur Co., supra, 236 F.2d at 546. This analysis was approved in Shamrock Oil & Gas Corp. v. Commissioner, 5 Cir. 1965, 346 F.2d 377, 381
 Maureen Fitzsimmons v. Commissioner, 1961, 37 T.C. 179, relied on by taxpayers also supports the result reached here, for the payments found to be bonuses in that case could not have been avoided by drilling or abandonment since they were mandatory payments for two years of the term of the lease. Similarly, in Cowden v. Commissioner, 5 Cir. 1961, 289 F.2d 20, this Circuit recognized the validity of a bonus payable in installments, at the same time taking note of the fact that the lessee was obligated to make the installment payments. Id. at 23.
 
 
 [5]
 Of course, this is not to say that every selection bonus is per se a delay rental. For instance, in Bennett v. Scofield, 5 Cir. 1948, 170 F.2d 887, this Court found that a $6 per acre payment for the selection of additional acreage that extended the lease on the additional acreage for fifteen years was a bonus payment